The next case is number 09-3070, Kinsey against the Department of the Navy. Mr. Bonney. Good morning, Your Honor. May it please the Court. You recall this case involves the Navy's high-profile up-armoring of combat vehicles in Kuwait. Mr. Kinsey was reported to Kuwait and reported that two co-workers and their supervisor were basically in a scheme to defraud the government of certain inflated lodging expenses. Kinsey disclosed that his supervisor had allowed the two co-workers to move into an apartment in a dangerous area of town in lieu of the secure Hilton Hotel that was designated as the place for the individuals to stay. Mr. Bonney, we understand the origin of the case, but what does Mr. Kinsey want here? He wasn't fired. He didn't lose his job. He wasn't demoted. He just wanted to get back to Kuwait, and he got back to Kuwait. So what's he looking for? Well, Your Honor, the problem here is when you have a whistleblower that is denied some type of right or benefit or some type of opportunity because of their whistleblowing activities, that is what the Whistleblower Protection Act is there to protect. In terms of, yes, he got back to Kuwait, but there was illness there three months later. In other words, he's not here to vindicate, to eliminate any retaliation that he allegedly suffered because of his whistleblowing. He just is complaining because he wasn't listened to. Well, Judge, in terms of dollars and cents, which always seems to make a difference, I think Mr. Kinsey estimated his damages to be right around $30,000 because of this delay. At the time... And what does that consist of? Higher wages because of Kuwait being where it is? At the time when these individuals were sent to Kuwait, they were working essentially half the time on, half the time asleep. That's basically the work routine. So it was considerable overtime. There was additional hazardous pay for being in a war zone. There was other additional compensation. But he did get back to Kuwait, didn't he? So the question ultimately is whether the agency would have taken the same action in the absence of his disclosure. Yes, sir. The sole issue is whether or not the Navy proved by clear and convincing evidence that it would have taken that action. Now, the question here about clear and convincing evidence is really where we're looking at in the issue. And Kinsey submits the decision finding clear and convincing evidence as an error because three different management employees gave four different reasons why Mr. Kinsey was not allowed to go back. And my question simply is, how can the agency meet the clear and convincing standard when they cannot decide who made the decision not to allow him to go back and not decide the reason for him not being allowed to go back? If you can't tell me who or why and you have conflicting results, then how can it be clear and convincing evidence? But there was evidence that they wanted to clear out the people from Kuwait who were part of the problem and then send Kinsey back. Well, there was four different reasons given by three different people. That is correct, Your Honor. That was one of the reasons. But you have to look at each one of them for perspective. That reason was given by Mr. Winkler. He was the person that was assigned to go back to Kuwait to send the individual that had been involved in the scam back, Mr. Lewis. They sent Mr. Lewis back and then Mr. Winkler took the place over there. His reason was specifically discounted by the supervisor back at the Norfolk Naval Shipyard who said he doesn't have any authority to make that decision, and he didn't. So that was one of the reasons, and that's my problem with this case. Every one of the reasons is contradicted by another supervisor. So you want us to weigh the testimony? I want you to tell the judge below that they have to decide who made the decision and why the decision was made so we can apply the Carr test. Because Carr is inapplicable in large part to this case, the clear and convincing test that this court enunciated, because we don't know who made the decision or the reason. But Mr. Bonney, the judge made it very clear. I find that Thompson and Shoemaker were the officials ultimately responsible for the delay. Far from retaliating against the appellant, these officials instead gave credence to the appellant's disclosures and acted promptly to resolve the situation. Actually, in her decision, she says at one point I mean, deal with it. There are two people who are found responsible and their actions are explained. Now, how do we quibble with that? Question to Shoemaker. Who made the decision to not allow Kinsey to go back? Every trial has evidence that can be quibbled with. And there's always something that sounds a little different than something else. Every witness sees things differently and states things differently. This court, however, doesn't make that kind of judgment. It has to decide if there is an abuse or if there's something arbitrary and capricious or lacking substantial evidence about what I just read to you. And I will read to you the answer from Mr. Shoemaker, the highest ranking official who was in charge of the entire operation. I don't know the answer to that. I think it was probably Winkler or Thompson or the people who were working for Thompson on the shipyard side. That's at appendix page 36. He says, I don't know who made the decision. The judge says that he made the decision. Then he comes back later and changes his mind and says, now, yes, I made the decision because there may have been an NCIS investigation, the Criminal Investigative Service investigation, regarding, of all people, Mr. Kinsey, who reported the violation. So evidently, there is substantial evidence to support this statement that Shoemaker and Thompson were ultimately responsible. Is there also substantial evidence that they were not retaliating? Remember, substantial evidence is any evidence to support it. You just stated the evidence that supports Shoemaker as one of the deciding officials. So that one's off the table. Now the question is, is there something that also supports the absence of retaliation? Well, Your Honor, I tend to disagree because I think what he says, I don't know the answer as to who made the decision. I think that that is his claim. Then he says that— And he comes back later and says, yes, I was one of those responsible. That's all the evidence this Court needs. As long as there's some evidence to support it, we don't look at all the contradictory static that there might be in the system. Judge, I think that the point is, at that point in time, the burden is on the agency to come forward with clear and convincing evidence. How can clear and convincing evidence be controverted by the individual in the case? Because he came back later and said, yes, I made the decision. Now I've seen the whole record. I'm better informed. I was the one, along with Thompson. And that's the finding. Well, Judge, the finding is incorrect. I mean, the finding is based on the fact that at the time that he actually made his statement, he did not even know that the NCIS investigation— Mr. Kinsey, when he arrived back in the United States to make his complaint about the whistleblowing activities, he immediately went to Thompson. I'm trying to help you out here. If all you can do is quibble with some of the static in the system, this Court doesn't review the facts, and the facts are static. So unless you can show us a short circuit in the system, some legal flaw, or some place where there's absolutely no evidence to support what the judge said, I'm afraid we can't help you. Let's look at the Winkler. She said that two people made the decision. She said that Winkler made the decision. Winkler denied making the decision. In fact, all the individuals she relied on to make the decision denied it in the case. All I'm asking for the Court to tell me is who made the decision and what was the reason. Shoemaker gave— I just read it to you. Thompson and Shoemaker did it. Well, Thompson said that the reason that Kinsey did not go back was because his name did not rise to the top of the list. Unfortunately, the person that he put in charge of the list testified, oh, yes, he did. He came to the top of the list. And at that point in time, Winkler told me not to send him back. And I asked the guy, I said, why did he tell you? He goes, some things you just don't ask. He knew why Thompson was not letting Kinsey go back, because he had made this particular complaint. So once again, if you have four different reasons, where is the clear and convincing evidence as to which one is the real reason? In fact, the reason relied on by Shoemaker was it was an NCIS investigation. He thinks that Kinsey turned himself in, I guess, to the NCIS. Later, he admits, Shoemaker says, guess what? I had no basis, no basis to determine that Shoemaker— Shoemaker says I had no basis to suggest that Kinsey was in any way involved in any misconduct over in Kuwait. In fact, what he says is that the NCIS gave him a clean bill of health. In fact, it was Kinsey that went to the NCIS to complain. So there was no basis whatsoever for Thompson to make his decision. And that's what I'm getting at when I look at where is the clear and convincing evidence that the agency is offering here. In fact, Winkler, the gentleman that was assigned over in Kuwait, he said he made the decision. He was positive he made the decision. The only problem with his decision was that Thompson specifically sent an email and specifically testified that Winkler had no authority not to send Kinsey. So I have three different individuals giving me four different reasons for it. Now, the test here is the Carr case. The Carr case, I say, is not really applicable because before you can get to the Carr test and apply those factors, you must first know who made the decision and what was the decision. Why? Because then you're going to look at the strength of the evidence. You're going to look at who may have been biased in this case and, you know, what happened. Until you know that, how do you apply the Carr test? Under Carr, we also consider the motive for retaliation. There was no motive on anybody's part to retaliate against Mr. Kinsey, was there? That was another decision that was clearly wrong. In fact, I cite the case where it says public scrutiny and public publicity. Judges, you will recall this was a- Who had a motive to hurt Kinsey? Shoemaker, Thompson, Winkler, Winkler. Let's start with Thompson and Shoemaker. Let me divert us a little bit because it certainly is clear that Kinsey was a whistleblower. Yes, sir. And whatever happened thereafter happened. But this takes me back to the point that I think Judge Lurie asked you about. He eventually was sent back for a tour. If that tour, his third, I believe, took place sooner rather than later, he would have come out the same way financially, would he not? Either way, you're asking for an even enlarged extension of the tour to fill the gap between the second and third tour while this agitation is going on. And I haven't seen anything in the record to support that he would, in fact, have been better off financially had he been returned sooner rather than later. Well, Judge, let me first start off by saying it's referred to as a third tour because that's the way the judge refers to it. Actually, it's a resumption of his second tour that was cut short. I've always disagreed with the way that she phrased that. She said this was a third tour and he had additional opportunities. That's not the case. He had to leave his second tour because he engaged in the whistleblowing activities. He was assaulted by one of the individuals that he had basically complained about getting preferential treatment, and now his tour was cut short. So he did nothing more than return to his prior tour. This was not a third tour. This was a second tour cut short. Okay, but that's where you get the $30,000, the unfinished portion. But you made another very good point, Judge. You go, well, you know, what's going to happen is he did get to come back at a later time. Well, Your Honor, there's no indication that he could not have stayed throughout this entire time because his unique skills had been requested. See, they needed somebody that could do the electrical work when they took the cab off and put the steel to protect the soldiers down, and Kinsey is a very good worker as the record reflects. He had been specifically requested by his supervisor, not the supervisor that we're talking about that got into all the trouble, but his supervisor to come back and fix that particular thing. So what the government did and the Navy did in this case, they actually hurt this process because Kinsey was an effective person who was working on that electrical system, and he was specifically asked to return to perform that work. So there's no indication that he could not have stayed for an additional period of time. So I believe they pulled out in November eventually, but he could have stayed that entire time because his services and his work was in particular demand because of his particular ability to do that electrical work. Let's hear from the other side. Mr. Austin. Thank you, Your Honor. May it please the Court. The decision of the Board that the Navy proved by clear and convincing evidence that it would have handled Mr. Kinsey's request to return to Kuwait for a third tour of duty in the same manner, whether or not he was a whistleblower, is, as this Court has indicated, supported by substantial evidence. What's your response to the information that he was, in fact, sent home sooner, that his second tour was cut short because he was a whistleblower? Well, first of all, Your Honor, he was never sent home by the Navy. Mr. Kinsey himself made the decision to leave Kuwait. Now, he says he made that decision... Before the tour was over? Yes. Now, he made that decision under some duress, and he made that decision because he claims he feared for his safety. But it's very important to remember that if you want to look at the primary cause for why he left the tour, it was his own decision. As the administrative judge, and therefore the Board, indicated in her decision... Now, this is a whistleblower case. Really, that's his concern. That's why we're here. That's right. If, in fact, because if one feels endangered because of having been a whistleblower and therefore takes an action or requests an action that otherwise might not be taken, isn't that a factor to be considered? It is, Your Honor, but I want to point out two things. The fact that he left Kuwait was prior to the time that he did the whistleblowing. He left Kuwait under the situations after the shock absorber, he alleges, was thrown at him. He then went back and did his whistleblowing. So he's not alleging that he left because of the whistleblowing. He's alleging that he left because he feared for his safety because of this underlying incident. So that's not really... The fear for his safety wasn't because of anything his supervisors might have done. Well, it actually was a little bit, Your Honor, because one of the reasons he left was because he was not happy with the way his supervisor responded when he advised the supervisor about the shock absorber incident. But the whistleblowing, Your Honor, took place after he returned from Kuwait. And that's my point on that. So as the judge indicated, he very easily could have simply said, and we're not holding him for this, if he feared for his safety, he was allowed to return to Kuwait and the Navy facilitated him in doing so. But he could, they had communications there in Kuwait, and he could have done his communications and done his whistleblowing from Kuwait, and the whole series of events here would have been changed. But the complaint that Mr. Kinsey has that there wasn't a decision, this Court has to understand, and the administrative judge understood, that this is not the typical scenario. The typical scenario is that there is a disciplinary action taken where you have a deciding official and a whole gathering of evidence, and you make your determination that way. So it's very clear who the deciding person is. Here there was no disciplinary action taken at all. And the Gonzales case, which is cited both in our brief and in Mr. Kinsey's brief, makes it very clear when doing the analysis under Carr, you take that into account. And instead of looking at generally, you know, who was the decision maker, you look at whether or not the Navy had legitimate reasons for taking the action it did, and it clearly had legitimate reasons. Were these fixed 60-day tours? Yes, they were, Your Honor. And the reason for that was, and I do want to address the $30,000 calculation because there's no evidence at all of that, but the reason for the 60-day tour was that everybody wanted to go to Kuwait, and they wanted to go to Kuwait because of the overtime opportunities there. There were 250 people lined up who put their names down to go to Kuwait. Mr. Kinsey was one of the lucky ones chosen initially to go. And there was only 50 people. There were 50 people who would go for 60-day tours. So he went on his first tour. He came back. Now, counsel speculates that, well, he could have stayed forever. Well, when his first tour was over, he didn't stay forever. He left on January 26th to go to Kuwait. He returned on March 23rd. He didn't go back to Kuwait until June 5th. So if he was so much in demand and no one else could do it, if this 250 people could do what he did, why was it two months until he went back? Had he stayed on this tour, 60 days would have been to the end of July, and then he may have been able to go back for a third tour. But if he did, if it was the same time span between the first and second tours, it probably would have been shorter than his actual third tour was. So it's not clear at all that he lost any time in Kuwait. And the union was involved here because the union had an interest in making sure that as many of these 250 people could go as possible so the normal process was when somebody went to Kuwait and they wanted to go back, as Mr. Kinsey clearly did, they would go to the bottom of the list and work themselves up. Now, counsel is correct that Mr. Durek, a supervisor in Kuwait, did request that he come back, and that would be taken into account. But it's not the only factor that gets taken into account. So there's no evidence at all that he was damaged. In fact, my understanding is that only a handful of the 250 people even got three tours of duty, as Mr. Kinsey did, and some of them didn't get any at all. The one issue that I did want to raise with the court, which I think is a legal issue, is the issue concerning counsel, Mr. Kinsey's contention that even though there's no causal connection to his whistleblowing, there is a causal connection to the fact that the underlying facts are the reason for the NCIS investigation, and therefore that's sufficient to show that, absent the protective disclosures, the Navy would have taken different action. And the answer to that's in the Carr case. Simply you have to look at Carr to determine the fact that if there's no causal connection to the fact that he's a whistleblower, and this court in its questioning indicated very accurately that there's no evidence whatsoever that there was any retaliation, and there's no evidence whatsoever there's any retaliatory motive, then you have to look at whether or not there was any retaliation motive here, and there wasn't, and that is decided by the Carr case. It was in the Carr case, Judge Carr, who was the person there, cited the Murano case, and Murano was very similar to the facts here because what happened in Murano, if the court may be familiar with that case, is where there was a DEA case where there was whistleblowing concerning the Albany office, and Mr. Murano, who was one of the whistleblowers, ended up having being transferred to the New York office, even though he did nothing wrong. And the allegation there was, well, but for these disclosures, they never would have known the problems in the Albany office, and I never would have been transferred to New York, and therefore there's a causal connection. Had I never made these protective disclosures, I never would have been transferred. And in Murano, the court said, well, you're right, and therefore you meet your burden to satisfy the contributory factor case. But the court in Carr said, that's the limitation of Murano. Murano did not go to the next element, and that is whether or not the government met its burden to show through clear and convincing evidence it would have taken the same action anyway. And Carr then went on in its case and distinguished it and said, even though Judge Carr made disclosures, and even though those disclosures led directly to the retaliatory action, the government would have made the same decision against Judge Carr because the deciding officials did not have a retaliatory motive. And that's the exact same situation we have here. As Your Honor indicated, people who made the decision here, as found by the administrative judge, Mr. Shoemaker and Mr. Thompson, to a lesser extent Mr. Winkler, had no motive whatsoever to retaliate. Another point I'd like to make is, counsel refers to the fact that there may have been this publicity, that there may have been some type of motive to retaliate on the part of Mr. Shoemaker and Mr. Thompson because of negative publicity to the shipyard, and he cites in his brief, Mr. Kinsey cites in his brief, the Arias case, which is not a case of this Court, it's a case of the Board. Arias is completely and entirely distinguishable and inapposite. What happened in Arias is that there was a disclosure made to the press, and that's why it was a publicity case. The administrative judge had found that it was not a protected disclosure. And because the administrative judge found that it was not a protected disclosure, it did not then go ahead and decide whether or not it was a contributing factor. And the Board reversed and said, no, you're wrong, this was in fact a protected disclosure, and because we're now finding it was a protected disclosure on remand, administrative judge, you need to find whether or not this protected disclosure was a contributing factor. So it has nothing to do with the fact that you automatically have to consider negative publicity as something that may have motivated Mr. Thompson and Mr. Shoemaker, when in fact the administrative judge found exactly the opposite, that they had no retaliatory motive. And unless the Court has any other reasons, any other questions for me, I would stop here and simply ask that the Court affirm the decision of the Merit Systems Protection Board. Any questions? Thank you, Mr. Austin. Thank you. Judge, I wanted to respond to your question. High visibility, congressional interest, career-changing events, that's a motive. In this particular case, everyone recalls every night on the nightly news about when these cars were being blown up and the need for the armor underneath. This was a career-changing event. Millions and millions of dollars were spent by the Army to hire the Navy to go out there and up-armor these vehicles. There was some clear motive in this case to prevent Kinsey going back and continuing to report. In addition to that, Thompson's son was running the operations over in Kuwait, so Thompson had interest. Winkler had interest because he was friends with the guy that got sent home. They had been friends for years at the shipyard. There was a lot of motives floating around, and that's why I thought that the judge needed to explain where she was coming from and identify the person who made the decision. As I've indicated, Shoemaker said it was Thompson or Winkler. Thompson said it was not Winkler and that he relied on Shoemaker, although Shoemaker said he didn't do it. There's just give me a chance to prove my case. Give me an opportunity to find out who made the decision and the reason why so then I can attack it. I agree with counsel that I think that the car decision is probably not the most applicable way of approaching it when you're dealing with a nondisciplinary type of situation. When you're dealing with these benefits or something that's taken from a whistleblower other than a disciplinary type action, I think this court needs to look at it a little bit differently. But if you look at Carr, I would say that Carr supports us in modifying the decision. First off, there is no evidence to support the action, specifically the strength of the agency's evidence. What is the strength of the agency's evidence in evaluating why Kinsey was not sent back? What is their evidence? No one can tell me what their evidence was. Shoemaker said he can't go back because of an NCIS investigation. However, it was Kinsey that brought the NCIS investigation. And he admitted later that he had no evidence whatsoever that Kinsey was involved in the illegal activities. In fact, Kinsey reported him. Thompson's first explanation was his name didn't come to the list. That was rebutted and that was abandoned later. So then Thompson says, oh, I relied on what Shoemaker told me. Then you get down to Winkler who said that he did the action. And then you go back to Thompson who said absolutely positively he had no authority to do that. And you're looking at the chain of command, Shoemaker, Thompson, and then the supervisor was sent over, Winkler. And all of them are blaming each other and giving different explanations. And the strength of the agency's evidence is none. Because none of the reasons hold up because they're all proven to be false. Motive we just talked about because you'd raise that. High visibility, millions and millions of dollars pouring in it, different connections. Factor three, the only person involved in this whistleblowing was Kinsey. He's the one that made the assessment. He was the one that was adversely affected. I know the Congress has suggested that we want to protect these individuals. Congress has told us that's why they created the new clear and convincing evidence standard. They said the other standard wasn't working. That's why they amended the act. They want to make sure these people are treated fairly. Why is Kinsey, and counsel's correct, Kinsey reported his whistleblowing when he got back. However, he also reported at the time he sat down with his supervisor in Kuwait, he said, listen, I was assaulted. A guy threw a shock absorber at me. And that wasn't alleged. I mean, the person that supported that was the supervisor, Dirk, who said that he's the one that told him that he'd thrown the shock absorber. He goes, I feel threatened. He goes, what are you going to do about it? And his supervisor, who was tied in with the illegal prostitution, with the drinking, with the off-duty misconduct, with the housing and the kickbacks, said, I'm not going to do anything about it. He goes, well, I have no recourse at this point because you're telling me you're going to do nothing about it but to return and report what I know to the supervisors there. And Kinsey, the first day he was back at work, reported that action and then said, first thing he said was, this is what's happening over there. I need somebody to take action. And they did. They removed that supervisor, and I want to go back because there is money to be made. And the estimate that I came up with, Kinsey testified, I think, that he was making approximately $10,000 a month, as well as most of the other people. Kinsey had been a fly in the ointment. He had made this millions and millions of dollars project where people were making – these are regular workers – making $10,000 a month over in Kuwait with the overtime. Mr. Bonney, we have to wrap it up. Okay. Thank you, Your Honors. Thank you so much. Appreciate it. Okay. Thank you, Mr. Bonney and Mr. Austin. The case is taken under submission. Thank you, Your Honor. Thank you. All rise. The Honorable Court has determined that Judge Morley is mayor. Good job. Good job.